# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
April 22, 2003 Session

## STATE OF TENNESSEE v. BRIGITTE PAULI

**Direct Appeal from the Circuit Court for Williamson County**
**No. I-2001-01-36    Donald P. Harris, Judge**

**No. M2002-01607-CCA-R3-CD - Filed June 5, 2003**

A Williamson County jury convicted the defendant, Brigitte Pauli, of three counts of theft of property over $60,000, one count of theft of property over $1,000, and one count of forgery. The trial court imposed an effective sentence of ten years and ordered the defendant to pay $4,458,203 as restitution. In this appeal, the defendant contends (1) the evidence was insufficient to support her convictions; (2) the trial court erred in prohibiting the defendant from questioning a witness regarding an alleged prior bad act by another witness; (3) the trial court erred in admitting evidence of the values and costs of producing various products; (4) the state made an untimely and improper election of offenses; (5) the trial court erred in allowing the state to present the testimony of a rebuttal witness; (6) the trial court erred in instructing the jury on flight; and (7) the trial court erred in sentencing the defendant. Upon our review, we merge the three counts of theft over $60,000 into one conviction and remand for a redetermination of restitution. Otherwise, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; Remanded for Redetermination of Restitution**

JOE G. RILEY, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and NORMA MCGEE OGLE, JJ., joined.

John H. Henderson, District Public Defender; and Douglas P. Nanney, Assistant District Public Defender, for the appellant, Brigitte Pauli.

Paul G. Summers, Attorney General and Reporter; Elizabeth T. Ryan, Assistant Attorney General; Ronald L. Davis, District Attorney General; and Lee E. Dryer, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

We preface this opinion by conceding our difficulty in deciphering the testimony through utilization of the video CD record of this multi-day, complex trial without the benefit of a written

transcript. The testimony involved numerous financial transactions in which various witnesses detailed a myriad of prices, costs and losses. Although several charts were introduced into evidence, a comprehensive chart of these various figures does not appear in the record. Nevertheless, we have tediously examined the video record in order to accurately set forth the testimony of the various witnesses. The Appendix sets forth a chart which we believe accurately reflects the testimony of the witnesses.

## A. State's Proof

In 1995, Peter Kolb, the president of AKO-ISMET, a German manufacturer of small appliances, hired the defendant, a native of Germany, as vice-president of AKO-USA, the company's United States branch located in Franklin, Tennessee. In September 1998, John Thiel, an employee of AKO-ISMET, visited the Franklin office and discovered incorrect purchase orders, sales reports, and accounting figures in the company's files. Thiel testified he gained access to the company's computer system through Jennifer Johnston, the office manager. He then informed Kolb and Manfred Zepf, the Director of Exports, of the irregularities, and they traveled to the United States to investigate.

Kolb and Thiel testified they interviewed the defendant and confronted her with the irregularities. During the interview, the defendant admitted she sold a large quantity of products to KMS, Inc., a liquidating company, at a price below production costs and failed to properly report the sales to AKO-ISMET. Kolb said the defendant acknowledged the sales would likely "destroy" the company. The defendant further stated she paid herself commissions from the proceeds of the sales to KMS and sent incorrect sales forecasts and planning figures to Germany.

Kolb testified that although the defendant was entitled to a salary of $107,000 per year, she informed him that as of September 1998, she had already withdrawn $111,000 in salary and $20,000 in expenses for the year. The defendant further stated she had spent the entire amount. Kolb and Thiel testified that the defendant admitted she formed a company called Global Product Sourcing (GPS), which aided other foreign companies that offered products competitive with those manufactured by AKO. She stated that while visiting Germany on behalf of GPS, she met with representatives from Centra, a competitor of AKO, and discussed the possibility of introducing Centra's products in the United States market. The defendant's employment was terminated.

Thiel testified he discovered numerous altered invoices dated from April to September 1998 in the defendant's computer files, and these invoices reflected higher prices per product and a lower quantity of products than were actually sold to KMS. The prices per product reflected in these altered invoices were within the range authorized by AKO. Thiel discovered the actual purchase orders and invoices, which reflected the actual sales to KMS. The actual sales reflected lower prices per product, which prices were not authorized by AKO, and a higher quantity of products sold than was reflected on the altered invoices. Thiel and Kolb testified a portion of the products sold to KMS came from AKO-USA's warehouse, while others were manufactured in Germany for the specific purpose of filling the orders. Kolb stated the defendant never told him she was selling these products to KMS, a liquidating company; rather, he believed she was selling the products to regular customers.

-2-

Kolb stated the company would not have manufactured the products for the sole purpose of selling them at a loss to a liquidating company.

Thiel testified as to the "market price," which was the lowest price authorized by AKO-ISMET at which the defendant could sell the product, and the cost of producing each product sold to KMS. He then calculated the loss at market price and the loss at cost of each invoice. The market loss represented the difference between the market price and the actual sales price, and the loss at cost represented the difference between the cost to produce the product and the actual sales price. Michael Spoeker, the commercial manager for AKO-ISMET, testified he provided the defendant with a list of authorized price ranges for each product, and he also testified as to the cost to produce the various products.[1]

The three counts of theft over $60,000 involved fifteen invoices reflecting sales to KMS and are more particularly described in the Appendix. The first count involved invoice numbers 2964, 3007, 3008, 3141, and 3193, from the period of April 24 to May 29, 1998. The second count involved invoice numbers 3236, 3395, 3477, 3550, 3549, 3614, and 3655, from the period of June 9 to August 12, 1998. The third count involved invoice numbers 3755, 3808, and 8456, from the period of August 26 to September 18, 1998. According to Thiel's detailed testimony, both the total loss at market price and the total loss at cost for each of the three counts exceeded $60,000.

Thiel testified he also discovered copies of checks written to the defendant for commissions from the sales to KMS. In addition, Thiel also found a copy of check number 10101 dated January 2, 1998, written to the defendant in the amount of $6,000 for commissions from an alleged sale to Sam's Club. No taxes had been deducted from the commission checks; thus, the commissions did not appear on the defendant's earnings report.

Kolb and Spoeker testified the defendant was not entitled to receive sales commissions under the terms of her employment contract. Rather, the defendant's contract provided she was to receive a bonus based upon the profitability of AKO-USA. Kolb stated the defendant's employment contract also included a non-competition agreement, which he opined she violated through her association with GPS. The contract, as translated into English and signed by the defendant on August 31, 1995, was introduced into evidence and reflected that "[o]n September 30, 1996, the formula for a result-oriented compensation program will be finalized and become part of this contract." In addition, a non-competition clause provided that the defendant was prohibited from

---

[1]As we previously noted, it has been extremely difficult to decipher from the testimony the various prices, costs and losses. Both Thiel and Spoeker testified as to these figures and each utilized one or more large charts. These specific charts apparently were not entered as exhibits and are not a part of the record. The trial court clerk retained four charts as exhibits due to their size; however, these are not the charts to which we referred. In numerous instances our calculations do not match the totals as calculated by the witnesses. Nevertheless, we do not view these inconsistencies as material to the actual convictions. Both the testimony and our calculations reveal that, as to each count charging theft over $60,000, the amounts exceeded $60,000. We also note that we have merged all three convictions for theft over $60,000 into a single conviction. These inconsistencies are material to the amount of restitution, however. *See* Appendix for a detailed chart depicting the various calculations.

participating with a competitive company, which included any company that researched, produced, or sold similar products to those of AKO-ISMET.

Thiel testified that in September 1998, he and the defendant discussed AKO-USA's aged accounts receivable report, which listed the amount of money each customer owed and the date each payment was due. The defendant gave Thiel a handwritten list of the amount each customer owed, and he generated a typewritten report which the defendant signed and dated September 17, 1998. Thiel then audited the accounts receivable schedule and determined the accounts for BC Coffee, Dillard's, Orgill, and Sam's Club were falsified.

Thiel testified Dillard's was listed in the customer ledgers, and, according to invoice number 3635 dated July 1, 1998, Dillard's had purchased goods in the amount of $107,600. However, the defendant admitted to Thiel that she created this false invoice. Verina Frietaein, an interpreter, testified she was involved in the translation of a report listing new customers in 1998, which the defendant sent to AKO-ISMET. The reported stated an agreement had been "reached" with Dillard's in June 1998 with deliveries scheduled to begin in September. DeWayne Morgan, a claims supervisor for Dillard's, testified AKO-ISMET and AKO-USA were not listed as vendors in the company's vendor records at any time.

Thiel testified he discovered invoice number 3660 dated July 1, 1998, in the defendant's computer files, which represented that Sam's Club had purchased products from AKO-USA in the amount of $500,000. The defendant admitted she altered this invoice, and Thiel found in the office files the actual invoice number 3660, which was dated August 12, 1998, and reflected a sale in the amount of $72.95 to Maroa Giardina, an actual customer of AKO-USA. Thiel testified the defendant also admitted to creating a false facsimile from Wal-Mart's traffic department, which discussed the purchase of various products and bore the signature of "Martin J. Cox." Thiel found a copy of the facsimile in the defendant's computer. Lynn Ford, a manager for Wal-Mart Stores, Inc., testified that according to the company's vendor records, Sam's Club did not have any outstanding accounts payable to AKO-USA as of September 1998. Ford also stated that according to the company's personnel records, Martin J. Cox was never employed in the traffic department.

Thiel stated the defendant also admitted she created a false facsimile purported to have been sent by Costco Wholesale. The document discussed a purchase order and bore the signature of "Scott Hines." Thiel opined the document was not faxed by Costco because the signature on the document was in the original ink rather than a copy of the signature, and the document was printed on the back of AKO stationary. Scott Hines testified he did not sign the document; the telephone number and fax number listed on the document were incorrect; the vendor number listed on the document was inconsistent with the manner in which the company assigned the numbers; and Costco did not order products through facsimiles.

Spoeker testified that throughout the spring of 1998, the defendant continued to inform AKO-ISMET sales were increasing and that AKO-USA was obtaining new customers. The defendant stated the company was selling products to Sam's Club, Costco, and Dillard's. Spoeker stated the defendant sent AKO-ISMET a planning document for each customer, which listed the quantities of the products sold and the prices. Based upon this information, AKO-ISMET

manufactured more products and shipped them to the United States.  However, the company never received payments from these customers.

Spoeker stated the company increased its spending due to the additional production required to fill the orders.  However, because no payments were received from the alleged sales to Sam's Club, Costco, and Dillard's, the company's cash account decreased.  As a result, in April 1998, Spoeker wrote the defendant a letter requesting she pay particular attention to the company's "liquidity" situation.  Spoeker testified the term "liquidity" referred to the company's availability of cash to pay creditors and was not synonymous with the term "liquidate."

Thiel testified that upon discovering the irregularities, he took over the U.S. operations and attempted to sell the products which had already been shipped from Germany.  However, he was unsuccessful because the defendant flooded the market with the company's products through the sales to KMS, and these products were available on the retail market at a lower price than the company's authorized "market" price.  Thiel stated the expense in shipping the products back to Germany would have been high, and the products could not be used in Europe due to the different electric cords and voltage requirements.  He stated his only option was to liquidate the remaining inventory, which he then sold to KMS.  Kolb testified he sold AKO-ISMET's small appliance division due to the financial difficulties which resulted from the defendant's actions.

Jennifer Johnston, AKO-USA's office manager, testified that only the defendant and David Rose, a manager, had the authority to sign checks drawn from the company's bank account.  She stated the defendant signed checks made payable to herself.  The defendant also instructed Johnston to prepare these checks without deducting taxes and, as a result, the disbursements did not appear on the defendant's payroll account.  Johnston stated the defendant instructed her to withdraw funds from the company's account and pay the defendant's credit card bill as reimbursement for "travel expenses."  Johnston testified charges on the defendant's credit card statement included expenses for spa treatments, purses, jewelry, and clothing.  She testified the defendant told her that the sales to KMS involved damaged products which were stored in the warehouse.  Johnston admitted she (Johnston) also received commissions from these sales.

Johnston testified that during the summer of 1998, the defendant held a meeting during which she stated an intern was visiting from Germany to observe the operations of the company.  The defendant told Johnston that she intended to change various accounting records on the computer.  The defendant lowered the quantities sold on the KMS invoices and raised the unit price of each product.  She also added sales from Sam's Club and Dillard's from which Johnston never saw invoices nor received payments.  Upon viewing the changes, Johnston requested the defendant write a memorandum stating she changed the files, and the defendant complied.  In this memorandum, the defendant stated that "it is sometimes necessary to update or change entries made earlier in the accounting program.  Any such changes will be made by me after reviewing these accounts on a monthly basis prior to doing the reports for Germany."  Johnston further stated that prior to Thiel's arrival, the defendant said she was changing the password on the computer in order to prevent Thiel from accessing the files.  However, Johnston gave the password to Thiel, who then conducted an investigation of the accounting records.

David Rose, the logistics and customer service manager for AKO-USA, testified that in January 1998, while he and the defendant were attending a convention in Chicago, the defendant spoke to him about meeting various liquidators and instructed him to contact the liquidators regarding the company's products. Rose stated the products sold to KMS were a mixture of goods stored in the warehouse and goods shipped from Germany. He opined the quality of these products was "good" and they were not damaged. When Rose expressed concern regarding the sales to KMS, the defendant told him that "she was doing her job and suggested [he] do [his]."

Rose testified the defendant told him that she formed GPS in order to help foreign companies introduce their products to the United States market. Rose stated one of the products sold by GPS, a heater, competed directly with AKO-ISMET. Upon returning from a trip to Germany, the defendant told Rose that she and Kolb discussed her compensation package. The defendant described Kolb's offer as a "joke" because she believed she was worth more than the offer. The defendant further stated that the company was going under, and when it did, she planned to work with GPS on a full-time basis. She informed Rose that by the time Kolb realized what had occurred, she would be gone.

Rose testified AKO-USA made no significant sales to customers other than KMS. The defendant instructed Rose that if anyone from AKO-ISMET called inquiring about Costco orders, he was to tell them he needed to contact Scott Hines. She further instructed him that later the same day, Rose was to fax AKO-ISMET stating Hines was out of town and could not be contacted.

Rose stated that after the defendant met with Kolb and Thiel in September 1998, she told him that she believed she was in trouble. Rose received a letter from the defendant a few weeks later with a return address in Ohio, but postmarked in New Mexico. The letter stated she had abandoned her Tennessee possessions and started a "new life." The envelope contained a key to the defendant's apartment, an inventory of the defendant's personal possessions which she requested Rose sell, and an account number in which Rose was instructed to deposit the proceeds. In the letter, the defendant further instructed Rose, "[p]lease don't try to get in touch with me to tell me what you're doing. Just take care of the things that need to be done for me to make peace with the past."

Scott Jebberas, the chief executive officer of KMS, testified KMS is a liquidating company that purchases close-out products from major manufacturers, which typically do not manufacture products to specifically sell to KMS. Jebberas testified that in January 1998, he met the defendant while attending a trade convention in Chicago. He stated he was interested in conducting business with AKO-USA because the company manufactured high quality merchandise typically found in department stores. Jebberas testified the defendant contacted him months later and explained she had excess products from sales to various retailers, such as Sam's Club and Costco. The defendant explained the retailers placed large orders; AKO-ISMET manufactured excess products; and they were unable to store the merchandise.

Jebberas testified KMS purchased table top grills from the company during subsequent sales transactions at a much lower price than the initial sales transaction. He stated the defendant did not attempt to negotiate for a higher price, but accepted the first price that he offered for the table top grills. Jebberas explained the electric grills were new to the United States market, and the grills

-6-

were manufactured in Germany and shipped to the United States. He testified that "[i]t was almost like they were making the product for us."

## B. Defense Proof

The defendant testified in her defense. She stated that when Kolb offered her a job, she was told she would receive a salary and would have the opportunity to earn commissions, bonuses, and profit sharing. The defendant executed a German employment contract with AKO in April 1995. The defendant, who is a German/English translator, translated the contract into English. The translation stated the defendant would receive a first year salary of $107,150 and that on September 30, 1996, "the formula for a result-oriented compensation program will be finalized and become part of this contract." The defendant testified she understood the contract to mean that she would receive a base salary plus sales commissions after the first year, although she conceded the contract did not use the term "commissions." She conceded, however, no further agreements were executed after the original agreement in April 1995. The defendant stated that, regardless, it was within her discretion to pay herself sales commissions.

The defendant explained that German companies use a series of titles to describe the varying levels of authority granted to corporate officials. According to the defendant, Peter Kolb indicated she was to have the authority afforded to a *geschaeftsfuhrer*, a corporate official similar to a managing director. The defendant described the relationship between AKO-USA and AKO-ISMET as one in which AKO-USA purchased products from AKO-ISMET at prices set by the German company.

The defendant testified that she and an independent sales company negotiated the sale of 35,000 electric grills to Sam's Club in 1997. The defendant stated that due to unexpected shipping costs, the independent company agreed to accept a reduced sales commission of 7% instead of its usual 10% commission as part of a renegotiated sales agreement. The defendant said she was entitled to a 3% sales commission of $54,600, which she did not immediately pay herself because of AKO-USA's distressed financial situation. The defendant testified that in 1998 she made partial payments to herself totaling no more than $30,000 for the unpaid commission. She stated these payments were made, in part, from the proceeds of the sales to KMS. She denied paying herself a commission from the sales to KMS. She further denied stealing anything from either AKO-USA or AKO-ISMET. The defendant said that before the sales to KMS, there had been discussions between AKO-ISMET and AKO-USA regarding cash flow. She testified that Spoeker instructed her to make sure AKO-USA had the funds it needed to pay AKO-ISMET.

The defendant admitted she prepared the false letter dated May 26, 1998, from Wal-Mart to her, but stated it was intended to slow the flow of products from Germany. The letter stated Wal-Mart would "low-stock" electric grills during June and July. However, she denied creating false invoices regarding the sales to KMS or forging the false facsimile from Costco Wholesale. The defendant testified that AKO-USA made no sales to Dillard's. She described an invoice from AKO-USA to Dillard's as "a fake," but denied that she generated the document. The defendant also indicated no sales agreement was reached with Costco, and Sam's Club placed no orders after March 1998. She stated that AKO-USA was involved in negotiations with Dillard's, Costco, and Sam's

Club in 1998, and that she advised AKO-ISMET these companies could potentially place orders. According to the defendant, she made proper corrections in the accounting system and, at the request of Jennifer Johnston, confirmed in writing that she made these changes. She further admitted signing the inaccurate accounts receivable report dated September 17, 1998; she explained the report was prepared hurriedly, and she had no intent to falsify it. The defendant also admitted that she wrote the letter to David Rose asking him to sell her belongings and stated she was moving to New Mexico.

Law professor Craig T. Smith, who formerly taught law at a German university and is fluent in German, testified for the defendant that a *geschaeftsfuhrer* in a German company would generally have the authority to set sales commissions. Smith further testified that a letter written in German by Spoeker dated April 20, 1998, instructed the defendant "to pay top priority to the liquidity situation" because cash flow problems between AKO-USA and AKO-ISMET were placing the company in danger. Smith stated that while a *geschaeftsfuhrer* would be required to follow an order issued by her superior, she would be authorized to deviate from the order if faced with danger to the company.

## C.  State's Theory and Charges

It was the state's theory at trial that the defendant deliberately sold the products to KMS at low, unauthorized prices in order to flood the market and drive AKO-USA out of business. In turn, the defendant could then profit from GPS, a company which she had formed to aid foreign companies in introducing products to the United States market.

The defendant was charged with three counts of theft of property over $60,000, one count of theft of property over $1,000, and one count of forgery. The first count of theft over $60,000 concerned invoice numbers 2964, 3007, 3008, 3141, and 3193, involving sales to KMS in April and May 1998. The second count of theft over $60,000 concerned invoice numbers 3236, 3395, 3477, 3550, 3549, 3614, and 3655, involving sales to KMS from June 9 to August 12, 1998. The third count of theft over $60,000 concerned invoice numbers 3755, 3808, and 8456, involving sales to KMS from August 26 to September 18, 1998. The theft over $1,000 count concerned the defendant's executing check number 10101 for $6,000 on January 2, 1998, made payable to herself for commissions from an alleged sale to Sam's Club. Finally, the forgery count alleged the defendant falsified an accounts receivable report dated September 17, 1998.

## D.  Convictions

The jury convicted the defendant on all counts as charged and imposed fines totaling $80,500. The trial court sentenced the defendant to ten years for each theft over $60,000 conviction, three years for the theft over $1,000 conviction, and two years for the forgery conviction, to be served concurrently, for an effective sentence of ten years. It also ordered the defendant to pay $4,458,203 in restitution to Peter Kolb.

# I. SUFFICIENCY OF THE EVIDENCE

The defendant contends the evidence was insufficient to support her convictions. We disagree.

## A. Standard of Review

When an appellant challenges the sufficiency of the evidence, the standard of review is whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560 (1979); State v. Evans, 838 S.W.2d 185, 190-91 (Tenn. 1992); Tenn. R. App. P. 13(e). On appeal, the state is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). This court will not reweigh the evidence, reevaluate the evidence, or substitute its evidentiary inferences for those reached by the jury. State v. Carey, 914 S.W.2d 93, 95 (Tenn. Crim. App. 1995). Furthermore, in a criminal trial, great weight is given to the result reached by the jury. State v. Johnson, 910 S.W.2d 897, 899 (Tenn. Crim. App. 1995).

Once approved by the trial court, a jury verdict accredits the witnesses presented by the state and resolves all conflicts in favor of the state. State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). The credibility of witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted exclusively to the jury as trier of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Brewer, 932 S.W.2d 1, 19 (Tenn. Crim. App. 1996). A jury's guilty verdict removes the presumption of innocence enjoyed by the defendant at trial and raises a presumption of guilt. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The defendant then bears the burden of overcoming this presumption of guilt on appeal. State v. Black, 815 S.W.2d 166, 175 (Tenn. 1991).

## B. Theft

A person commits "theft of property" if, "with intent to deprive the owner of property, the person knowingly obtains or exercises control over the property without the owner's effective consent." Tenn. Code Ann. § 39-14-103. Therefore, in order to obtain a theft conviction, the state must establish "(1) the defendant knowingly obtained or exercised control over property; (2) the defendant did not have the owner's effective consent; and (3) the defendant intended to deprive the owner of the property." State v. Amanns, 2 S.W.3d 241, 244-45 (Tenn. Crim. App. 1999). Consent is not effective if it is induced by deception. Tenn. Code Ann. § 39-11-106(a)(9)(A). Furthermore, a person "deprives" an owner of property when he or she disposes of the property, uses it, or transfers an interest in the property in such a manner as to make restoration unlikely. *Id.* § 39-11-106(a)(8)(C).

### 1. Theft over $60,000

In the case at bar, the defendant was convicted of three counts of theft of property valued over $60,000. The state's theory of the case was that by placing orders to AKO-ISMET for products for the purpose of selling them to KMS at unauthorized prices, the defendant exercised control over the property without the consent of the company. The proof at trial established the defendant made numerous sales to KMS, a liquidating company, without the knowledge of Kolb and AKO-ISMET and at prices significantly below those authorized by the company. Kolb and Spoeker testified that while some of the products sold to KMS came from inventory stored in the company's warehouse, other products were manufactured for the specific purpose of filling the orders. Kolb stated he was unaware of the KMS sales and would not have manufactured the products for the sole purpose of selling them to a liquidator. Spoeker stated the defendant had falsely represented that AKO-USA was selling the products to various retailers such as Sam's Club, Costco, and Dillard's.

Thiel testified to the prices at which the defendant was authorized to sell the products, the prices at which the defendant actually sold the products, and the losses at market price and at cost sustained by the company as a result of the sales. In addition, according to Thiel's testimony, the losses on each invoice exceeded $60,000. Upon viewing the evidence in the light most favorable to the state, we conclude the evidence was sufficient to support the three convictions for theft over $60,000.

The defendant contends the proof failed to establish she committed a criminal offense; rather, her actions merely amounted to a civil breach of contract. In support of her argument, the defendant cites to Amanns, 2 S.W.3d at 245, in which a panel of this court held that the evidence was insufficient to support a conviction for theft though fraudulent breach of trust. In reversing the defendant's conviction, this court stated that although the facts of the case supported a civil breach of contract claim, the proof failed to establish any intent to defraud. *Id.* However, unlike the facts presented in Amanns, the evidence presented in the case at bar established the defendant ordered products from AKO-ISMET representing that the products were to be sold to various retailers while actually selling the merchandise to KMS. Furthermore, as discussed above, the proof presented at trial was also sufficient to establish the remaining elements of theft. The defendant clearly exercised control over the property; she intentionally deprived the owner of the property by disposing of it; and she did not have the owner's effective consent because of her deception. *See* Tenn. Code Ann. § 39-14-103; -11-106(a)(8), (9).

The defendant submits the evidence was insufficient to establish the value of the property involved in the alleged thefts. The value of the property is measured by the fair market value of the property at the time and place of the offense or the cost of replacing the property, if fair market value cannot be ascertained. *Id.* § 39-11-106(a)(36)(A). In this case, fair market value cannot be properly calculated because of the defendant's actions in flooding the market. Thus, we look to cost of replacement.

Thiel testified not only to the company's loss at the authorized market price, but also the loss at cost due to the KMS sales. The loss at cost represented the difference between the cost to produce the products and the revenue generated by the KMS sales. According to Thiel's testimony, the losses at cost for each invoice exceeded $60,000. We conclude this evidence was sufficient to

-10-

establish the losses sustained by the company as a result of the defendant's actions in unlawfully depriving the owner of the property.

The defendant contends she had the authority to make the sales to KMS. However, the trial court instructed the jury regarding claim of right as an affirmative defense of theft. *See* Tenn. Code Ann. § 39-14-107. The jury rejected this defense which was the jury's prerogative. By rejecting this defense, the jury concluded the defendant did not honestly believe that she had the right to sell the products at the prices of the various sales. This issue is without merit.

### 2. Theft over $1,000

The defendant was convicted of theft of property valued over $1,000 for check number 10101 dated January 2, 1998, which the defendant wrote to herself in the amount of $6,000. A note on the check indicated it was for a commission from a sale to Sam's Club. Thiel testified he found a copy of the check in the company's files, and the amount of the distribution did not appear in the defendant's earnings report. Kolb and Spoeker testified the defendant was not entitled to receive commissions under the terms of her employment contract. Viewing the evidence in a light most favorable to the state, we conclude the evidence was sufficient to support the conviction.

## C. Forgery

A person commits "forgery" when he or she "forges a writing with intent to defraud or harm another." Tenn. Code Ann. § 39-14-114(a). "Forge," as applicable to the case at bar, includes making false entries in books or records. *Id.* § 39-14-114(b)(1)(B).

The defendant was convicted of forgery of an accounts receivable report dated September 17, 1998. Thiel testified the defendant supplied him with the names of customers and the amount each customer owed the company. Using this information, he generated the report which the defendant signed. Thiel stated that upon auditing the accounts receivable report, he determined that the defendant falsified accounts for BC Coffee, Dillard's, Orgill, and Sam's Club. AKO was not listed as a vendor in Dillard's vendor records, and, according to Wal-Mart's vendor records, Sam's Club did not have any outstanding accounts payable to AKO in September 1998.

Spoeker testified that when the defendant ordered products from Germany, she represented to the company that she was selling the products to various retailers such as Dillard's and Sam's Club. In addition, Rose stated the defendant informed him that by the time Kolb realized what she had done, she would be gone. Viewing the evidence in a light most favorable to the state, we conclude the evidence was sufficient to support the forgery conviction.

## II. EVIDENCE OF SPECIFIC INSTANCES OF CONDUCT

The defendant contends the trial court erred in prohibiting defense counsel from questioning David Rose regarding a specific act allegedly committed by Jennifer Johnston. We disagree.

## A. Trial Proceedings

During cross-examination by the defendant, Johnston acknowledged the defendant once loaned her $5,000 from company funds, which she later repaid. Counsel then asked Johnston whether she had once written herself a $4,000 check from the company's account and signed the defendant's name, while the defendant was on vacation. Johnston denied the allegation.

During cross-examination of Rose, the defendant attempted to inquire about Johnston's actions, and the state objected. The state argued the testimony was inadmissible under Tennessee Rule of Evidence 608, and the trial court agreed and sustained the objection.

The defendant then made an offer of proof regarding Rose's testimony. Rose testified that while the defendant was on vacation, Johnston requested he sign a company check written to her for $1,800, stating she had the defendant's permission. Upon returning from vacation, the defendant denied giving Johnston permission to write the check. When Rose and the defendant confronted Johnston with the check, Johnston explained she had an emergency and needed the money. The defendant told Johnston to ask for permission the next time she needed money because she would have given Johnston the loan regardless.

The trial court refused to admit the testimony based upon Tennessee Rule of Evidence 608. It found that Rose had not testified to Johnston's character trait for truthfulness or untruthfulness; therefore, his testimony regarding an alleged specific instance of prior conduct committed by Johnston was inadmissible.

## B. Tennessee Rule of Evidence 608(b)

Generally, specific instances of conduct, other than criminal convictions, committed by a witness, which are offered for the purpose of attacking or supporting the witness's credibility, may not be proven through extrinsic evidence. Tenn. R. Evid. 608(b). However, if the conduct is probative of truthfulness or untruthfulness, it may be inquired into on cross-examination of the witness "concerning the character for truthfulness or untruthfulness of another witness as to which the character witness being cross-examined has testified." *Id.* On appeal, a trial court's ruling pursuant to Rule 608(b) is subject to an abuse of discretion standard. State v. Reid, 91 S.W.3d 247, 303 (Tenn. 2002).

In the case at bar, the defendant asked Johnston on cross-examination whether she had written a company check to herself and signed the defendant's name, and Johnston denied the allegation. Under Rule 608(b), "the witness's answers must be taken as given. Other witnesses cannot be called to rebut the first witness's response." N. Cohen et al., **Tennessee Law of Evidence** § 6.08[5] (4th ed. 2000).

The defendant attempted to question Rose on cross-examination regarding the check. However, Rose did not testify to Johnston's character for truthfulness or untruthfulness. Furthermore, Rose did not testify as a character witness for Johnston; rather, his testimony was presented as part of the state's case-in-chief. Therefore, we conclude the trial court properly excluded the testimony based upon Rule 608(b).

The defendant contends the evidence was admissible to demonstrate Johnston's bias against the defendant and motive in testifying. However, the defendant fails to explain how this evidence would demonstrate bias or motive, and we are unable to make such a determination from the facts. This argument is without merit.[2]

## C.  Right of Confrontation

The defendant also submits she was denied the constitutional right of confrontation through the trial court's refusal to admit the evidence. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9. The right to confrontation also includes the right to cross-examination. *See* Tennessee v. Street, 471 U.S. 409, 414, 105 S. Ct. 2078, 85 L. Ed. 2d 425 (1985). However, not every denial of the right to cross-examine a witness is constitutional error. *See* State v. Wyrick, 62 S.W.3d 751, 783 (Tenn. Crim. App. 2001).

In determining the scope of cross-examination, courts should inquire whether the testimony would be "direct" or "collateral." State v. Hutchison, 898 S.W.2d 161, 168-69 (Tenn. 1994). Issues of credibility are generally classified as collateral matters. *Id.* at 169. In order to contradict a collateral fact, counsel must ask the witness being impeached about the contradictory fact during cross-examination and must accept the witness's response. N. Cohen et al., *supra*, § 6.07[4][b]. Counsel cannot use the testimony of other witnesses to prove the collateral matter. *Id.*

In the case at bar, the defendant attempted to cross-examine Rose regarding the incident in order to contradict Johnston's denial of the incident. We conclude Rose's testimony involved a collateral matter, and the defendant's right of confrontation was not violated by its exclusion.

## D.  Due Process

Finally, the defendant argues the trial court violated her constitutional right to present a defense by limiting the scope of her cross-examination of Rose. *See* State v. Brown, 29 S.W.3d 427, 433 (Tenn. 2000). In determining whether the constitutional right to present a defense has been violated by the exclusion of evidence, the court should consider whether: "(1) the excluded evidence is critical to the defense; (2) the evidence bears sufficient indicia of reliability; and (3) the interest supporting exclusion of the evidence is substantially important." *Id.* at 434.

Upon examination of these factors, we conclude the defendant's right to present a defense has not been violated. Rose's impeachment testimony was not critical to the defense. Furthermore, although the testimony may bear some indicia of reliability, the interest supporting exclusion of the evidence is substantially important. This issue is without merit.

## E.  Harmless Error

---

[2]The defendant does not contend the evidence is admissible under Tennessee Rule of Evidence 404(b). We make no determination of such admissibility. However, if the evidence was admissible under 404(b), we conclude the refusal to admit this evidence was harmless. *See* Tenn. R. App. P. 36(b).

Even if the trial court erred, we cannot conclude the defendant was prejudiced. The defendant testified at trial that Johnston wrote the check without her permission and forged the defendant's signature. Therefore, evidence of Johnston's alleged misconduct was presented to the jury. Furthermore, overwhelming evidence of the defendant's guilt was presented at trial through witnesses other than Johnston. Accordingly, any error the trial court may have committed in limiting the defendant's cross-examination of Rose was harmless beyond a reasonable doubt.

## III. EVIDENCE REGARDING VALUES AND COSTS TO PRODUCE PRODUCTS

The defendant contends the trial court erred in admitting evidence regarding the values and costs to produce numerous AKO products. She maintains the admission of this evidence was both detrimental and prejudicial. This issue is waived as the defendant has failed to cite to the record and failed to cite authority to support her argument. Tenn. Ct. Crim. App. R. 10(b); State v. Schaller, 975 S.W.2d 313, 318 (Tenn. Crim. App. 1997).

## IV. ELECTION ISSUE

The defendant contends the state failed to make a timely and proper election of offenses. We disagree.

### A. Trial Proceedings

The defendant was originally indicted on sixteen separate counts of theft and one count of forgery. In its amended bill of particulars, the state aggregated the sixteen counts of theft into three counts of theft over $60,000 and one count of theft over $1,000. The three counts of theft over $60,000 related to sales to KMS as reflected in fifteen separate invoices, and the one count of theft over $1,000 related to a $6,000 check for a commission from an alleged sale to Sam's Club.

At the close of the state's case-in-chief, the trial court held a hearing outside the presence of the jury regarding the issue of election. The state informed the trial court that its theory regarding the three counts of theft over $60,000 was that the sales to KMS were the actual thefts. The trial court permitted the state to aggregate the fifteen invoices reflecting the sales to KMS into three separate counts of theft over $60,000. However, the trial court informed the state that it would require the jury to make a separate finding regarding each transaction.

At the conclusion of the trial, the jury was provided with a verdict form which listed each invoice that was the subject of each of the three counts of theft over $60,000. The jury indicated on the verdict form that it found the defendant guilty of three counts of theft over $60,000 and that each separate transaction in each count was the subject of theft.

### B. Election of Offenses Generally

The doctrine of election requires the state to elect a set of facts when it has charged a defendant with one offense, but there is evidence of multiple offenses. State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1999). This doctrine is applied to ensure that the defendant can prepare for the

specific charge, to protect the defendant from double jeopardy, and to ensure that some jurors do not convict on one offense and other jurors on another. State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993). Issues of jury unanimity usually arise where the state presents evidence showing more than one criminal offense, but the underlying charging instrument lacks specificity as to the offense for which the accused is being tried. State v. Brown, 762 S.W.2d 135, 136-37 (Tenn. 1988). Where the evidence indicates the commission of only one offense, even though different criminal acts constitute that offense, there is no election requirement nor a requirement to give an enhanced unanimity instruction. State v. Johnson, 53 S.W.3d 628, 632-35 (Tenn. 2000).

Initially, we question whether an election was required. An election is not required where only one offense has been committed, nor is it necessary for the trial court to give a special unanimity instruction. *Id*. Where various acts constitute but one offense of theft, election is not required and a general unanimity instruction would be sufficient to ensure a guilty verdict of theft over $60,000. State v. Black, 75 S.W.3d 422, 426 (Tenn. Crim. App. 2001). Regardless, we will examine the issue to ascertain whether the defendant was prejudiced by the manner in which these offenses were presented to the jury.

## C. Timeliness

The defendant contends the state failed to make an election in a timely manner, and as a result, she was not given adequate opportunity to prepare her defense. We disagree.

The record reveals the state specified the offenses at the conclusion of its case-in-chief, which was timely. *See* Burlison v. State, 501 S.W.2d 801, 804 (Tenn. 1973). However, the Tennessee Supreme Court has noted that "in practice, . . . election at the end of the state's proof does little to aid the defendant in preparing for his defense. A defendant is obviously better served by requesting a bill of particulars before trial. . . ." Shelton, 851 S.W.2d at 137. Here, the defendant successfully obtained a bill of particulars, which detailed the allegations upon which the theft charges were based. We conclude the defendant was provided with ample time and information in order to prepare for the charges against her, and the state specified the offenses in a timely manner.

## D. Manner of the Election

The defendant maintains the state made an improper election of the offenses charged. We disagree.

-15-

The state aggregated the values of the theft charges relating to the KMS sales into three counts of theft over $60,000.[3] In convicting the defendant of three counts of theft over $60,000, the jury separately indicated on the verdict form that it found each transaction was a theft. This requirement of a separate finding ensured juror unanimity, and, as discussed above, the defendant had ample opportunity to prepare for the charged offenses by utilizing the information provided in the bill of particulars. This issue is without merit.

We also note the counts for theft over $1,000 and forgery each involved the commission of one criminal act per offense. Therefore, there was no election requirement regarding these two charges.

## E. Double Jeopardy

An issue remains as to whether the defendant's three convictions for theft over $60,000 violates double jeopardy. However, because this issue was not raised on appeal, we must first find plain error in order to address it.

An error which has affected the substantial rights of a defendant may be noticed at any time in the discretion of the appellate court where necessary to do substantial justice. State v. Taylor, 992 S.W.2d 941, 944 (Tenn. 1999). "Plain error" or "fundamental error" is recognized under Tenn. R. Crim. P. 52(b). State v. Adkisson, 899 S.W.2d 626, 639 (Tenn. Crim. App. 1994). Some errors are so fundamental and pervasive that they require reversal without regard to the facts or circumstances of the particular case. Delaware v. Van Arsdall, 475 U.S. 673, 681, 106 S. Ct. 1431, 1436, 89 L. Ed. 2d 674 (1986).

There are five factors which must be present for a court to determine "plain error" exists:

> (a) the record must clearly establish what occurred in the trial court;
> (b) a clear and unequivocal rule of law must have been breached;
> (c) a substantial right of the accused must have been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (citing Adkisson, 899 S.W.2d at 641-42).

The constitutional right against double jeopardy protects against (1) a second prosecution after an acquittal; (2) a second prosecution after a conviction; and (3) multiple punishments for the same offense. State v. Beauregard, 32 S.W.3d 681, 682 (Tenn. 2000). The present issue concerns the third category of protections.

---

[3]Generally, aggregation of the values of separate thefts is permissible where the separate larcenous acts are: "(1) from the same owners; (2) from the same location; and (3) pursuant to a continuing criminal impulse or a single sustained larcenous scheme." State v. Byrd, 968 S.W.2d 290, 291 (Tenn. 1998).

Multiplicity involves the creation of several offenses from a single offense. <u>State v. Phillips</u>, 924 S.W.2d 662, 665 (Tenn. 1996). In determining whether offenses are multiplicitous, we note the following principles:

> 1. A single offense may not be divided into separate parts; generally, a single wrongful act may not furnish the basis for more than one criminal prosecution;
> 2. If each offense charged requires proof of a fact not required in proving the other, the offenses are not multiplicitous; and
> 3. Where time and location separate and distinguish the commission of the offenses, the offenses cannot be said to have arisen out of a single wrongful act.

*Id.* (citations omitted).

Whether a defendant's acts constitute several thefts or a single offense must be determined on a case-by-case basis. <u>State v. Epps</u>, 989 S.W.2d 742, 746 (Tenn. Crim. App. 1998). If each act of theft is the result of a separate intent, each act is a separate offense. *Id.* However, if the acts result from a single intent, there is only one theft offense. *Id.*

In the case at bar, we conclude the three separate convictions for theft over $60,000 was plain error and violated the prohibition against double jeopardy. The acts upon which the convictions were based arose from a single criminal episode, involved the same victim, and occurred at the same location. Therefore, the acts constituted only one offense of theft. *See* <u>Black</u>, 75 S.W.3d at 426 (noting the accused's actions in embezzling money from her employer for a period of three years constituted one theft offense).

Accordingly, we remand the case to the trial court for merger of the three convictions of theft over $60,000 into one conviction. However, because the trial court ordered the sentences for the convictions to run concurrently, the merger has no impact on the effective length of the defendant's sentence.[4]

## V. RELEVANCE OF REBUTTAL TESTIMONY

On rebuttal, the state presented the testimony of Bea Stoups, a former AKO-USA employee. Stoups testified that "just before the Germans came," the defendant asked her to shred checking records. Stoups also said that later the same day, the defendant used her arms to conceal the contents of a large check register from Stoups's view. On appeal, the defendant contends this testimony was irrelevant and prejudicial, and, therefore, inadmissible. However, the defendant failed to object to this testimony on these grounds at the time it was offered. By failing to make a contemporaneous objection to testimony, a defendant waives appellate consideration of the issue. <u>State v. Alder</u>, 71 S.W.3d 299, 302 (Tenn. Crim. App. 2001); <u>State v. Thompson</u>, 36 S.W.3d 102, 108 (Tenn. Crim. App. 2000).

---

[4]We conclude the theft over $1,000 conviction need not be merged. It occurred earlier than the criminal episode involving theft over $60,000 and was different in nature. Likewise, the forgery conviction need not be merged.

Regardless, we find this issue to be without merit. During the defendant's testimony, she denied shredding any documents. Stoups's testimony was relevant to the issue of whether the defendant destroyed or altered the company's records to conceal her actions. It was proper to allow the state to present such evidence during rebuttal.

## VI. FLIGHT INSTRUCTION

The defendant next argues that the jury instruction on flight was not warranted by the evidence. *See* T.P.I. - CRIM 42.18 (7th ed. 2002); State v. Kendricks, 947 S.W.2d 875, 885-86 (Tenn. Crim. App. 1996) (holding this instruction is a correct statement of the law).

There is sufficient evidence to support a jury charge on flight where there is proof of "both a leaving the scene of the difficulty and a subsequent hiding out, evasion, or concealment in the community." State v. Burns, 979 S.W.2d 276 app. at 289-90 (Tenn. 1998). In the instant case, there was proof that on January 15, 1999, the defendant sent a letter to David Rose bearing an Ohio return address, but postmarked in New Mexico. In that letter, the defendant stated she had "abandoned" her possessions in Tennessee, indicated she had started a "new life," and asked Rose to clean out her apartment and dispose of her belongings so that she could "make peace with the past." Also, the defendant testified she was arrested in New Mexico.

The clear import of the defendant's letter to Rose was that she left Tennessee, the scene of her difficulty, and was seeking refuge in parts unknown. We conclude this evidence was more than sufficient to support the flight instruction.

## VII. SENTENCING

The trial court sentenced the defendant to ten years for each theft over $60,000, three years for the theft over $1,000 and two years for the forgery, with all sentences to run concurrently. The defendant contends the trial court improperly applied enhancement factors and, therefore, imposed an excessive sentence. She further maintains the trial court improperly imposed restitution. We will address each argument separately.

### A. Standard of Review

A defendant who challenges his or her sentence has the burden of proving the sentence imposed by the trial court is improper. Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). It is this court's duty to conduct a *de novo* review of the record with a presumption the trial court's determinations are correct when a defendant appeals the length, range, or manner of service of his or her sentence. Tenn. Code Ann. § 40-35-401(d). The presumption of correctness is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999).

### B. Length of Sentence

In imposing the defendant's sentence, the trial court applied enhancement factor (6), the amount of damage to property taken from the victim was particularly great; enhancement factor (15), the defendant abused a position of public or private trust; and mitigating factor (1), the defendant's criminal conduct neither caused nor threatened serious bodily injury. *See* Tenn. Code Ann. §§ 40-35-113(1), -114(6), (15) (1997).[5] The defendant maintains the trial court erred in applying the enhancement factors. However, at the sentencing hearing, the defendant conceded the cost to the victim was high and that she abused a position of private trust. Since an appellant cannot change theories from the trial court to the appellate court, this argument is waived. Alder, 71 S.W.3d at 303. Further, it appears from our review of the record that the length of each sentence is proper.

Although theft offenses ordinarily are not subject to enhancement under factor (6) because the amount of the theft determines the felony classification, *see* State v. Grissom, 956 S.W.2d 514, 518 (Tenn. Crim. App. 1997), it may be properly applied when the amount of the theft greatly exceeds the amount necessary to qualify for the felony classification. State v. Jacob Dyck, No. E2001-00476-CCA-R3-CD, 2002 Tenn. Crim. App. LEXIS 355, at *22 (Tenn. Crim. App. Apr. 22, 2002, at Knoxville), *perm. to app. denied* (Tenn. 2002). Here, we have combined the three theft convictions over $60,000 into a single conviction, and the amount of this theft was in the millions of dollars. However, enhancement factor (6) would not apply to the theft over $1,000 nor to the forgery. We, therefore, conclude both enhancement factors (6) and (15) are applicable to theft over $60,000, and enhancement factor (15) was properly applied to theft over $1,000 and forgery.

The defendant contends the trial court erred in failing to consider the defendant's remorse, acceptance of responsibility and lack of a prior criminal record in mitigation. *See* Tenn. Code Ann. § 40-35-113(13). The trial court sentenced the defendant to the mid-range sentence of ten years for theft over $60,000, which is a Class B felony with a range of punishment of eight to twelve years. *Id.* § 40-35-112(a)(2). The trial court sentenced the defendant to a mid-range sentence of three years for theft over $1,000, which is a Class D felony with a range of punishment of two to four years. *Id.* § 40-35-112(a)(4). The trial court sentenced the defendant to two years for forgery, which is a Class E felony with a range of punishment of one to two years. *Id.* § 40-35-112)(a)(5). Even if the trial court erred in not considering these miscellaneous mitigating factors, we would still conclude the sentences are appropriate. Thus, the defendant is not entitled to relief as to the length of her sentences.

## C. Restitution

The trial court ordered the defendant to pay a total of $4,458,203 in restitution to Peter Kolb as the victim. We remand for a redetermination of restitution.

---

[5]Effective July 2002, the legislature amended Tennessee Code Annotated section 40-35-114 by adding "terrorism" as an enhancement factor. 2002 Tenn. Pub. Acts, ch. 849, § 2(c). This is listed as factor (1), thus renumbering the previous factors as (2) through (23). *See* Tenn. Code Ann. § 40-35-114 (Supp. 2002). Our opinion refers to the enhancement factors as they existed at the time of sentencing as specified in Tennessee Code Annotated section 40-35-114 (1997).

-19-

## 1.  Restitution with a Sentence of Confinement

The defendant argues that because she was denied alternative sentencing, the trial court was without authority to order her to pay restitution.  This argument is without merit.  The trial court is authorized to order the payment of restitution in conjunction with a sentence of continuous confinement for a felony conviction.  *See* Tenn. Code Ann. § 40-35-104(c)(2) (1997).[6]

## 2.  Restitution to Peter Kolb as Victim

The defendant also argues the trial court improperly ordered restitution be made to Peter Kolb.  She maintains that payment to Kolb will result in a windfall to him since the proof established he was not the sole shareholder of AKO-ISMET.  Based upon the record before us, we are unable to determine the party entitled to restitution.

The indictments alleged the "owner" of the stolen property was AKO-ISMET.  The owner of the property would ordinarily be the victim.  The evidence at trial indicated that Peter Kolb was an owner of AKO-ISMET along with another family member or members.  The status of AKO-ISMET and AKO-USA at the time of sentencing is unclear.  We are unable to determine from the record why the trial court ordered restitution to Kolb as the victim.  We remand for additional findings as to the proper victim for purposes of restitution.

## 3.  Amount of Restitution

The trial court ordered the defendant to pay $1,237,187 in restitution in count 1; $2,320,996 in restitution in count 2; $897,020 in restitution in count 3; and $3,000 in restitution in count 4.  It did not articulate its method for determining these amounts.  The state contends the amount of restitution ordered on the thefts over $60,000 represents the total losses at cost.  We have been unable to accurately extrapolate the losses at cost based upon the testimony so as to arrive at the figure set by the trial court.  *See* Appendix.  We are further unable to determine the manner in which the trial court determined the $3,000 in restitution for the theft over $1,000, whereas the unauthorized check was for $6,000.  Regardless, the defendant argues she was ordered to pay an unreasonable amount of restitution.

The state contends that the statutory procedures set forth in Tennessee Code Annotated section 40-35-304(a)-(f) have no application to restitution ordered as a result of theft when restitution is not a condition of probation.  *See* State v. Charles Chesteen, No. E1999-00910-CCA-R3-CD, 2000 Tenn Crim. App. LEXIS 455, at **35-37 (Tenn. Crim. App. June 8, 2000, at Knoxville).  However, Charles Chesteen was decided under the statutes in effect prior to July 1, 1996.  Effective July 1, 1996, Tennessee Code Annotated section 40-35-304(g) was added and provides that the procedures for a defendant sentenced to pay restitution in addition to total confinement "shall be the same as provided in this *section*" with certain exceptions.  (Emphasis added).  This court must give effect to the natural and ordinary meaning of statutory language within

---

[6]This statute went into effect July 1, 1996.  *See* 1996 Tenn. Pub. Acts, ch. 699, § 5.

the context of the entire statute. <u>State v. Goodman</u>, 90 S.W.3d 557, 563 (Tenn. 2000). Accordingly, we examine the issue of restitution under section 304.

## (a) Defendant's Ability to Pay Restitution

The sentencing court must consider not only the victim's loss, but also the financial resources and future ability of the defendant to pay or perform in determining the amount and method of payment. *See* Tenn. Code Ann. § 40-35-304(d) (1997). The sum of restitution ordered must be reasonable and does not have to mirror or equal the precise pecuniary loss. <u>State v. Smith</u>, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994). An order of restitution which obviously cannot be fulfilled serves no purpose for the defendant or the victim. <u>State v. Johnson</u>, 968 S.W.2d 883, 886 (Tenn. Crim. App. 1997).

At sentencing, the state conceded the improbability of the defendant making full restitution. The trial court found the defendant received relatively little personal benefit from the thefts, despite the amount of loss to the victim. However, there is no indication that it considered the defendant's ability to pay in rendering its ruling. We further note that the defendant had been declared indigent. Therefore, we remand this matter to the trial court for redetermination of restitution, including findings regarding the defendant's ability to pay restitution and for further findings regarding the other requirements of Tennessee Code Annotated section 40-35-304.

## (b) Victim's Pecuniary Loss

Any determination of the victim's actual pecuniary loss must be based on realistic values. <u>Smith</u>, 898 S.W.2d at 747. "Pecuniary loss" is defined as:

> (1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and
> (2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

Tenn. Code Ann. § 40-35-304(b) (1997).

It is unnecessary to determine restitution in accordance with the strict rules of damages applied in civil cases. <u>Johnson</u>, 968 S.W.2d at 887. However, though the rules of damages are relaxed, they are not completely discarded. <u>State v. Bottoms</u>, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001). In the instant case, it is the value of the stolen products which constitutes the victim's pecuniary loss on each conviction for theft over $60,000. The term "value" as it relates to the theft statute is measured by "(t)he fair market value of the property . . . at the time and place of the offense," or, "(i)f the fair market value of the property cannot be ascertained, the cost of replacing the property within a reasonable time after the offense." Tenn. Code Ann. § 39-11-106(a)(36)(A).

Given the unusual circumstances of this case, we conclude that it would be impractical to attempt a determination of the fair market value of the products at the time of the transactions. The proof established that the actions of the defendant negatively impacted the products' market value. John Thiel testified that after he took charge of AKO-USA, he was unable to sell the company's products to anyone other than a liquidator because the defendant had flooded the market. For this reason, we conclude the fair market value of the products cannot be ascertained. Thus, the value of the products should be determined by the cost of their replacement. Under the circumstances, the victim's cost of replacing the products can reasonably be inferred from the victim's cost to produce the products.

However, the proof also established that the defendant was authorized to sell the products at the "market price" established by the company. The proof showed that the "market price" for some of the products was less than the cost to produce them; the victim's pecuniary loss on these products is the difference in the actual amount received and the "market price." Further, we note there was no evidence concerning the market price of the water kettles listed in invoice number 3477 dated July 8, 1998. *See* Appendix. Therefore, upon remand, the trial court should determine the market price for the water kettles before determining restitution for them.

In summary, based on the facts contained in the record, the victim's pecuniary loss for the conviction for theft over $60,000 is the sum of its losses for each group of products unlawfully sold to KMS. The formula for determining the victim's pecuniary loss on each product would be the difference between the lesser of the "market price" or the cost to produce the product, and the amount received from sale of the product to KMS. We are unable to make these calculations due to the discrepancies as can be seen in the Appendix.

Upon remand, the trial court should make specific findings concerning the proper victim or victims and the amount of restitution pursuant to Tennessee Code Annotated section 40-35-304. If the trial court intends to impose restitution commensurate with the victim's actual pecuniary loss, the trial court must set forth its method for calculating the amount of the loss as part of the record. The use of the chart in the Appendix should prove helpful.

**CONCLUSION**

In summary, we conclude the evidence was sufficient to support the defendant's convictions. In addition, there was no reversible error regarding the various evidentiary issues. Furthermore, the state made a proper election of offenses; the trial court properly instructed the jury on flight; and the defendant's effective sentence of ten years was not excessive. However, we conclude the defendant's three convictions for theft over $60,000 violate double jeopardy principles, and we remand to the trial court for merger of the three convictions into one conviction of theft over $60,000 with a sentence of ten years. Finally, we remand to the trial court for a redetermination of restitution. The judgments of the trial court are otherwise affirmed.

_____
JOE G. RILEY, JUDGE

It has been extremely difficult to decipher from the testimony the various prices, costs and losses. Thiel's testimony regarding the invoices of sales to KMS and the losses based upon his calculations, as well as Spoeker's testimony regarding the cost of each product, are summarized to the best of our ability in the following chart. There are numerous instances in which the testimony as to the losses is inconsistent with underlying bases upon which the losses are allegedly calculated.

| COUNT 1 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Invoice No./ Date | Product | Actual Quantity Sold | Actual Unit Price | Market Price | Total Market Loss | Cost to Produce | Total Loss at Cost |
| 2964/ 04-24-98 | Fan Heater | 13,740 | $4.00 | $16.00 | | $16.13 | |
| | Double Coffeemaker | 1,000 | $17.00 | $59.00 | | $40.73 | |
| | Single Coffeemaker | 3,000 | $10.00 | $39.00 | | $22.34 | |
| SUBTOTAL: | | | | | $287,000* | | $227, 416 |
| 3007/ 05-05-98 | Fan Heater | 15,000 | $5.00 | $19.50 | $217,500 | $20.13 | $226,950 |
| 3008/ 05-05-98 | Double Coffeemaker | 2,534 | $17.00 | $59.00 | | $40.73 | |
| | Single Coffeemaker | 736 | $10.00 | $39.00 | | $22.34 | |
| | Fan Heater | 1,260 | $4.00 | $19.50 | | $20.13 | |
| SUBTOTAL: | | | | | $149,192* | | $90,605* |
| 3141/ 05-19-98 | Single Coffeemaker | 8,904 | $11.25 | $39.00 | $247,086 | $22.34 | $98,745 |
| 3193/ 05-29-98 | Single Coffeemaker | 8,000 | $11.25 | $39.00 | $222,000 | $22.34 | $88,720 |
| **TOTAL ON COUNT 1** | | | | | $1,122,778* | | $732,436* |

| COUNT 2 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Invoice No./ Date | Product | Actual Quantity Sold | Actual Unit Price | Market Price | Total Market Loss | Cost to Produce | Total Loss at Cost |
| 3236/ 06-09-98 | Table Top Grill | 10,000 | $21.00 | $55.00 | $240,000** | $44.67 | $236,700 |
| 3395/ 06-25-98 | Single Coffeemaker | 1,200 | $11.25 | $39.00 | | $22.34 | |
| | Double Coffeemaker | 6,000 | $15.00 | $59.00 | | $40.73 | |
| SUBTOTAL: | | | | | $297,300 | | $167,688 |
| 3477/ 07-08-98 | Table Top Grill | 25,000 | $12.00 | $55.00 | | $44.67 | |
| | White Water Kettle | 2,840 | $5.00 | No Testimony | | $34.91 | |
| | Black Water Kettle | 600 | $5.00 | No Testimony | | $33.81 | |
| SUBTOTAL: | | | | | $1,191,960* | | $918,980 |
| 3550/ 07-21-98 | Table Top Grill- Stainless Steel | 7,000 | $12.00 | $64.00 | $364,000 | $66.23 | $379,610 |
| 3549/ 07-21-98 | Double Coffeemaker | 8,000 | $15.00 | $59.00 | $352,000 | $40.73 | $205,840 |
| 3614/ 08-04-98 | Table Top Grill | 7,615 | $12.00 | $55.00 | $327,445 | $44.67 | $248,782 |
| 3655/ 08-12-98 | Table Top Grill | 5,000 | $12.00 | $55.00 | $250,000*** | $44.67 | $163,350 |
| TOTAL ON COUNT 2 | | | | | $3,022,705* | | $2,320,950 |

| COUNT 3 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Invoice No./ Date | Product | Actual Quantity Sold | Actual Unit Price | Market Price | Total Market Loss | Cost to Produce | Total Loss at Cost |
| 3755/ 08-26-98 | Table Top Grill | 20,000 | $12.00 | $55.00 | $860,000 | $44.67 | $653,400 |
| 3808/ 09-08-98 | Heater | 8,000 | $14.00 | $35.00 | $168,000 | $24.27 | $82,160 |
| 8456/ 09-18-98 | Heater | 6,000 | $14.00 | $35.00 | $126,000 | $24.27 | $61,620 |
| TOTAL ON COUNT 3 | | | | | $1,154,000 | | $797,180 |

*These totals do not coincide with our calculations based upon the quantity, actual sales price, and market price or cost to produce.

**Our calculations indicate this amount should be $340,000.

***Our calculations indicate this amount should be $215,000.